**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LAUREANA LEDEZMA, an individual

      Plaintiff,

v.

YOUNG LIFE, a Texas Nonprofit Corporation whose principal place of business is Colorado Springs, Colorado,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

    Plaintiff Laureana Ledezma, by and through counsel Iris Halpern and Ellen K. Giarratana of RATHOD ǀ MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

**<u>NATURE OF THE CLAIMS</u>**

    This is an action for a racially hostile work environment under 42 U.S.C. § 1981, and assault pursuant to state law. Plaintiff also intends to move to amend her Complaint as soon as she administratively exhausts her sex, race, national origin, and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended by Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

    In high school, Laureana Ledezma discovered Defendant Young Life, an organization that seeks to introduce adolescents to Jesus Christ. Having participated in some of Young Life's programs, Ms. Ledezma sought permanent employment with the

organization. To her horror, while volunteering and then working for Young Life, Ms. Ledezma's coworkers racially and sexually harassed her. Because Young Life fostered a culture of impunity for her harassers, the harassment became violent. One of Ms. Ledezma coworkers, Cory Lange, assaulted Ms. Ledezma, by shoving his hand down her apron and groping her genitalia. Despite regularly reporting the harassment and the assault, management did nothing. On the contrary, one of Ms. Ledezma's mangers told Ms. Ledezma that the harassment was "God's plan." Ms. Ledezma was constructively discharged after she witnessed male campers grope a female camper's breasts and Young Life once again did nothing when she reported it.

## I.      PARTIES, JURISDICTION, AND VENUE

1.      Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1337, and 1343. This Action is authorized and instituted pursuant to 42 U.S.C. § 1981 and when amended to include Plaintiff's Title VII claims, is also authorized pursuant to 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981a.

2.      Jurisdiction over Plaintiff's state law claims is proper under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims arising under federal law that they form part of the same case or controversy.

3.      At all relevant times, Ms. Ledezma was a legal resident of and domiciled in the State of Colorado.

4.      From May 2019 until July 3, 2019, Ms. Ledezma was a full-time volunteer for Defendant Young Life.

5.      From August 1, 2019 until March 30, 2020, Ms. Ledezma was a part-time employee for Defendant Young Life.

6.      Defendant Young Life is a non-profit corporation formed under the laws of the State of Texas with its headquarters and principle place of business in the State of Colorado.

7.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  The events and omissions alleged herein occurred within the State of Colorado.  At the time of the events and omissions giving rise to this litigation, all of the parties resided or conducted business in Colorado.

## II.      ADMINISTRATIVE EXHAUSTION AND NOTICE OF FUTURE CLAIMS

8.      Ms. Ledezma is contemporaneously filing a Charge of Discrimination with the EEOC against Defendant Young Life alleging discrimination on the basis of sex, race, and national origin, as well as retaliation in violation of Title VII.

9.      Ms. Ledezma intends to amend this Complaint to reflect administrative exhaustion of her Title VII charges as soon as she can request and receives a Notice of Right to Sue from the EEOC.

10.      The factual allegations supporting her Title VII claims are the same as those found below.

## III.      FACTUAL ALLEGATIONS

### Background Facts

11.      Defendant Young Life is an organization with the goal of "[i]ntroducing adolescents to Jesus Christ."

12.     Defendant Young Life operates programming for students in middle school through college.

13.     Defendant Young Life maintains active chapters internationally, including summer camps in sixteen states and six countries.

14.     Rocky Creek Ranch is a "resort-quality camp operated by Young Life" located in Bayfield, Colorado.

15.     Young Life registered Rocky Creek Ranch as a trade name with the Colorado Secretary of State.

16.     Young Life has exclusive access to Rocky Creek Ranch for its summer camp programming.

17.     Young Life hosts campers and "ensures that the activities of kids are closely monitored."

18.     Volunteering is central to Defendant Young Life's structure and culture.

19.     Volunteers are subject to an application process that includes a criminal background check and reference checks of the applicant's past employers.

20.     Young Life volunteers work in a variety of capacities throughout the year such as volunteering at camps and working with youth groups.

21.     Young Life is structured so that field staff and volunteer leaders all work under trained supervisors.

22.     Almost all staff members must volunteer with Defendant Young Life before becoming paid staff members.

23.     Defendant Young Life has exclusive control over volunteers' activities.

4

24.     Defendant Young Life dictates volunteers' job assignments, their duties, and their daily schedules.

25.     Defendant Young Life can discontinue non-paid staff service at any time.

26.     Camp volunteers are not permitted to switch job assignments without Defendant Young Life's approval.

27.     Young Life volunteers, interns, and part-time staff members do not receive sexual or racial harassment training.

28.     Young Life volunteers, interns, and part-time staff members do not receive training on discrimination in the workplace.

29.     Training on topics of discriminatory behavior at Young Life is reserved for full-time staff members.

***Ms. Ledezma's History with Young Life***

30.     Ms. Ledezma first learned of Young Life in high school.

31.     It was during those years that Ms. Ledezma participated in Young Life's summer camp program.

32.     When Ms. Ledezma reached college age, she began volunteering with and donating financially to Defendant Young Life on a regular basis.

33.     Ms. Ledezma's ultimate goal was to become a full-time staff member of the organization.

34.     Ms. Ledezma's mentor and Area Director, Zach Kreeger, recommended that she train with a staff member and volunteer at a Young Life summer camp.

35.     For months, Ms. Ledezma trained with Young Life Staff Associate Tyler Deines in preparation to move into his Staff Associate position when he was eventually promoted.

36.     In March 2019, Defendant Young Life promised Ms. Ledezma a full-time Staff Associate position to begin in the fall of 2019.

***Young Life Subjected Ms. Ledezma to Discriminatory Working Conditions and a Hostile Work Environment at Young Life's Rocky Creek Ranch Camp***

37.     At the beginning of May 2019, Ms. Ledezma was preparing to spend six weeks volunteering in the kitchen at Young Life's Rocky Creek Ranch.

38.     On May 20, 2019, Christa Williams, the Young Life Northern Weld County Area Director, emailed all the incoming female volunteers and staff at Rocky Creek Ranch with the subject line "CALLING ALL RCR LADIES."

39.     In this email, Ms. Williams called on the female volunteers and staff to use their empowerment and freedom to "serve our men."

40.     The email reminded female staff members and volunteers that they were at camp for "Jesus, not our future husbands."

41.     The email continued, "[a] really tangible way we can serve our men in a very common struggle is by being conscious of what we wear."

42.     A common refrain among single men at Young Life is "Young Life, find a wife."

43.     Ms. Ledezma found the tone of the email sexist and offensive.

44.     Ms. Ledezma contacted other female volunteers on the email chain who reported that they were also offended by the email.

6

45.     Ms. Ledezma then organized a meeting with the other female volunteers to discuss the email and its impact with Ms. Williams.

46.     Camp began on May 27, 2019.

47.     The meeting was scheduled for May 29, 2019.

48.     On the first day of camp, Ms. Ledezma learned that she was the only woman of color working at Rocky Creek Ranch.

49.     Ms. Ledezma is Latina and of Mexican ancestry.

50.     Three other white females and about eleven white males worked in the kitchen.

51.     As a kitchen volunteer, Ms. Ledezma's duties included preparing food and cleaning the dining room.

52.     Prior to the May 29 meeting, two other kitchen volunteers, Jake Holtzfield and Cory Lange made unwanted sexual advances toward Ms. Ledezma.

53.     When Messrs. Lange and Hotzfield walked by Ms. Ledezma in the kitchen, they pressed their bodies against Ms. Ledezma, intentionally pushing into her with their crotch.

54.     Messrs. Lange and Holtzfield did not similarly press up against the other white females in the kitchen.

55.     Ms. Ledezma reported the sexual harassment to Ms. Williams at the May 29, 2019 meeting in front of approximately ten other female volunteers.

56.     Ms. Ledezma told Ms. Williams that she was uncomfortable in the kitchen with Messrs. Lange and Holtzfield because they had intentionally pressed their bodies against hers.

57.     Ms. Williams apologized to the group of ten female volunteers for the tone of her email but did not otherwise comment about Ms. Ledezma's sexual harassment complaint.

58.     Shortly thereafter, Ms. Williams approached Ms. Ledezma and told her to explain to Messrs. Lange and Holtzfield why their behavior made Ms. Ledezma uncomfortable.

59.     Ms. Williams did nothing to prevent further harassment from Messrs. Lange and Holtzfield.

60.     Nor did Ms. Williams provide guidance or assistance about how to approach Messrs. Lange and Holtzfield.

61.     Ms. Ledezma thus confronted Messrs. Lange and Holtzfield about their behavior and explained to them that she was uncomfortable with them invading her space.

62.     Mr. Holtzfield stopped sexually harassing her thereafter.

63.     Mr. Lange, however, continued to make sexual advances towards Ms. Ledezma.

64.     Other volunteers at the camp encouraged Ms. Ledezma to reciprocate Mr. Lange's advances.

65.     Ms. Ledezma told many female volunteers, including one that worked in the kitchen, that she was not interested in Mr. Lange in part because of racial dynamics.

66.     Ms. Ledezma told Mr. Lange that she was not sexually or romantically interested in him.

67.     Mr. Lange continued to sexually harass Ms. Ledezma.

68.     Mr. Lange did not harass any other women at camp, all of whom were white.

69.     As the sole Latina within camp, Ms. Ledezma was the exclusive target of Mr. Lange's harassment.

70.     Mr. Lange repeatedly used his hand to stroke Ms. Ledezma's butt while walking past her in the kitchen.

71.     On several occasions, when Ms. Ledezma was standing in front of the refrigerator, Mr. Lange reached between her legs and touched her inner thigh.

72.     Mr. Lange also groped Ms. Ledezma's butt, shoulders, back, and waist.

73.     Mr. Lange often quoted Bible verses when he groped Ms. Ledezma.

74.     Ms. Ledezma continually told Mr. Lange to stop harassing her.

75.     Because of this recurring misconduct, Ms. Ledezma suffered anxiety attacks and often retreated to the bathroom to avoid seeing Mr. Lange.

76.     Supervisory Intern Hailey Young discovered Ms. Ledezma while she was having a panic attack in the bathroom.

77.     Ms. Ledezma told Ms. Young that she was being sexually harassed by Mr. Lange.

78.     Shortly thereafter, Ms. Ledezma told Ian, another staff member, that she was being sexually harassed by Mr. Lange.

79.     Both Ms. Young and Ian told Ms. Ledezma that she was overreacting, and that Mr. Lange did not intend any harm by his behavior.

80.     Ms. Young and Ian surmised that Mr. Lange's sexually harassing behavior was the natural result of working with Ms. Ledezma in such small kitchen.

81.     Neither Ian nor Ms. Young took any further action to address Ms. Ledezma's complaint.

82.     On June 6, 2019, after Ms. Ledezma had reported Mr. Lange's harassment, Defendant Young Life rescinded the full-time position it had promised her.

83.     Defendant Young Life instead offered Ms. Ledezma a part-time position without further explanation for its decision.

84.     Around the same time, Mr. Deines was promoted to Team Leader.

85.     Mr. Deines prior position was not filled.

86.     Ms. Ledezma accepted the part-time position.

87.     Later in the summer, Ms. Ledezma disclosed Mr. Lange's sexually harassing behavior to full-time staff member Lauren Cary and a work crew boss, Evan.

88.     These staff members also excused Mr. Lange's behavior.

89.     During the six-week camp program, Ms. Ledezma asked to switch job assignments with a friend, Hannah Cassel, so she no longer had to work with Mr. Lange in the kitchen.

90.     Defendant Young Life denied Ms. Ledezma's request and instead switched her kitchen shift from the morning to the afternoon.

91.     Mr. Lange also worked the afternoon shift in the kitchen.

92.     Ms. Ledezma shared her experience of harassment with Ms. Cassel and Daunté Cordiel, a Latino male volunteer and one of three other people of color at the camp.

93.     Ms. Cassel and Mr. Cordiel were the only individuals at the camp who believed Ms. Ledezma's complaints of sexual harassment.

94.     Ms. Cassel and Mr. Cordiel were in no position to prevent the harassment from continuing and did not know to handle Ms. Ledezma's complaints given that they had received no training regarding harassment, discrimination, and reporting policies at Young Life.

95.     On or around June 21, 2019, Summer Staff Coordinator Alan Hampden approached Ms. Ledezma to discuss Mr. Lange.

96.     During this discussion, Mr. Hampden told Ms. Ledezma that Mr. Lange was a "really good guy" and was "just trying to get to know her."

97.     On June 27, 2019, while working in the kitchen, Mr. Lange thrust his hand beneath Ms. Ledezma's apron and grabbed her genital area over her pants, manipulating his fingers over her labia.

98.     Ms. Ledezma slapped Mr. Lange's hand away and yelled "what the fuck?"

99.     The kitchen was fully staffed with approximately fifteen people at the time of this attack.

100.    Ms. Ledezma immediately told the Assistant Chef, Chandler, and ran out of the kitchen, crying.

101.    Ms. Williams found Ms. Ledezma in the woods and persuaded her to return to her cabin.

102.    When they returned, Mr. Lange was waiting outside Ms. Ledezma's cabin.

103.    Ms. Williams forced Ms. Ledezma to talk to Mr. Lange.

104.    Ms. Ledezma again told Mr. Lange his advances were unwanted, and that she was uncomfortable when he touched her.

105.    Later that night, Mr. Lange approached Ms. Ledezma during a worship session and gave her a long hug in front of the rest of the staff.

106.    Ms. Ledezma felt threatened and triggered by Mr. Lange touching her.

107.    The following week, Ms. Ledezma was so distressed before work that she vomited prior to work.  Ms. Young witnessed Ms. Ledezma vomiting.

108.    Ms. Young permitted Ms. Ledezma to skip the last week of work in the kitchen.

***Defendant Young Life Ignored and Perpetuated Sexual Harassment and Racial Hostilities in the Workplace***

109.    Ms. Ledezma also felt isolated and singled out by the white-dominated space at the camp.

110.    This feeling intensified as Ms. Ledezma transitioned into her part-time staff position.

111.    Ms. Ledezma began working part-time for Defendant Young Life on August 1, 2019.

112.    Ms. Ledezma worked as an Emerging Leader Development ("ELD") staff member for the Broomfield/Adams County area.

113.    An ELD's main job is to cultivate diversity and inclusion in the workplace.

114.    During Ms. Ledezma's training, she was prevented from speaking about her experiences as a woman of color.

115.    In one instance, a staff member told a group of trainees that it was their job to "sit and listen," and that they did not yet have enough experience to speak up about social and cultural issues.

116.    Ms. Ledezma was one of two people within Young Life's Broomfield/Adams County of Latin descent.

117.    Ms. Ledezma was the only Latina woman in her area within Young Life's Broomfield/Adams County.

118.    At a staff meeting, Ms. Ledezma expressed that she was uncomfortable with Young Life's practice of collecting participants' racial demographics without considering ethnicity.

119.    A senior staff member dismissed Ms. Ledezma's concern and told her that she was not being a "team player."

120.    On another occasion, when Ms. Ledezma was helping students study for an upcoming Spanish test, Young Life volunteer Tyler Fisher asked if Ms. Ledezma was "speaking terrorist."

121.    Ms. Ledezma immediately reported this incident to Volunteer Leader Connor Atencio.

122.   The incident was not addressed.

123.   At one point, Mr. Atencio dressed up as a mariachi musician and made jokes about Mexicans.

124.   Mr. Atencio instructed everyone in attendance to plug their ears except for Ms. Ledezma so he could ask her whether his jokes were offensive.

125.   Ms. Ledezma had apparently been dubbed the "race police."

126.   In one instance, Ms. Ledezma shared her point of view with a group of students during a discussion about racism.  Mr. Fisher told the group that Ms. Ledezma was calling them racists.

127.   In a meeting, Mr. Kreeger told Ms. Ledezma he needed her to "get loud" with some of her "Latina spice."

128.   Because of her comments surrounding race, Ms. Ledezma gained a reputation for "not wanting to work with people" and being "bossy."

129.   In the first few months of her part-time employment Ms. Ledezma's area director, Zach Kreeger, asked about her summer camp experience.

130.   Ms. Ledezma told Mr. Kreeger she did not have a good experience and was made to feel uncomfortable by men at the camp.

131.   Instead of addressing her concerns, Mr. Kreeger pressed her to share positive experiences.

132.   Ms. Ledezma confided in Laura Rose, a Latina woman and the Area Director for the much more diverse chapter of West Denver.

133.    Ms. Rose urged Ms. Ledezma to report her experiences to Human Resources.

134.    Shortly after Ms. Ledezma began her part-time employment, Mr. Kreeger and another staff member, influenced by the stereotype that Latina women are sexually promiscuous, questioned Ms. Ledezma about her sex life during staff meetings.

135.    Ms. Ledezma had to convince her peers she was remaining abstinent according to God's will at professional staff meetings.

136.    Her white female coworkers were not subjected to similarly humiliating interrogations.

137.    Likewise, during a conversation with Mr. Atencio, Mr. Atencio explained that it was appropriate for him to date multiple women, but it was "slutty" for women to date multiple men.

138.    Mr. Atencio then reminded Ms. Ledezma that it would be inappropriate for her to have a "sleepover" with her fiancé, another Young Life staff member.

139.    Other Young Life white couples were not given the same repeated reminders.

140.    Ms. Ledezma reported this upsetting conversation to Mr. Kreeger.

141.    Mr. Kreeger did not address her concerns with Mr. Atencio.

142.    Later, from January 31, 2020 to February 2, 2020, Ms. Ledezma chaperoned Defendant Young Life's "Urban Week" retreat to Winter Park, Colorado.

143.    Urban Week is targeted toward students from inner-city neighborhoods.

144.    Urban Week is intended as an outing for Defendant Young Life's students of color.

145.    At Urban Week, Ms. Ledezma saw two boys grope a young woman beneath her breast.

146.    The girl told the boys "I told you not to do that" and flinched away.

147.    Ms. Ledezma told the boys to stop.

148.    Ms. Ledezma reported the boys' behavior to their area director, Kelsey Bradley.

149.    The area director made the boys apologize but instituted no further punishment.

150.    After witnessing Defendant Young Life do nothing to protect a young woman from sexual harassment, Ms. Ledezma felt compelled to report in writing her own experience.

151.    On or around February 3, 2020, Ms. Ledezma lodged yet another complaint with Human Resources regarding Mr. Lange's behavior, this time in writing.

***Despite Numerous Complaints, Defendant Young Life Continued to Fail to Investigate Mr. Lange's Assault of Ms. Ledezma***

152.    In mid-February 2020, Young Life Human Resources told Ms. Ledezma that Terry Leprino, the Regional Director, would be handling the investigation moving forward because it involved "staff relations."

153.    On February 25, 2020, Ms. Ledezma met with Ms. Leprino and Mr. Kreeger.

154.    Ms. Ledezma requested that staff member and fellow Latino Felipe Contreras be present as an ally and pillar of support.

155.    Ms. Leprino told Ms. Ledezma to have faith that everything would be alright and to trust that God would resolve the issues she was having.

156.    Ms. Leprino told Ms. Ledezma that the sexual harassment she endured were all part of "God's plan" for her.

157.    Ms. Ledezma pressed Ms. Leprino for information on the investigation into Mr. Lange's conduct.

158.    Ms. Leprino admitted she had not made progress and needed to contact Ms. Williams to get the full story.

159.    After receiving this response, Ms. Ledezma no longer felt safe working for Young Life, especially as a person of color and a woman.

160.    It was clear to Ms. Ledezma that Young Life would take no steps to protect her from harassment in the future or to investigate or remedy any harassment she reported.

161.    On March 30, 2020, Defendant Young Life constructively discharged Ms. Ledezma.

### IV. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Civil Rights Act of 1866**
**42 U.S.C. § 1981**

162.    Plaintiff hereby incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

163.    42 U.S.C. § 1982 guarantees all persons within the jurisdiction of the United States the same right in every State and Territory to make and enforce contracts and to the full and equal benefit of all laws and proceedings for the security of property as enjoyed by white citizens.

164.    The constitutional right to be free from discrimination codified in 42 U.S.C. § 1981 prohibits racial, ethnic, and alienage discrimination in the making or enforcement of private contracts, including those inherent in the employment relationship.

165.    Plaintiff is Latina and of Mexican descent.

166.    Plaintiff belongs to a protected class under in 42 U.S.C. § 1981.  *See St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611 (1987); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir. 1979).

167.    Defendant Young Life discriminated against Plaintiff in violation of 42 U.S.C. § 1981 based on her race.

168.    Defendant Young Life, by and through the conduct of its employees and agents, unlawfully denied Plaintiff the benefits, privileges, and terms and conditions of her employment due to her race.

169.    Defendant Young Life additionally discriminated against Plaintiff in violation of 42 U.S.C. § 1981 by subjecting her to a hostile work environment because of her race, and by creating and tolerating a hostile work environment because of her race.

170.    The offensive race-based hostile work environment described in the preceding paragraphs, including but not limited to, subjecting her to racially degrading

comments and sexual harassment because of the intersection of her race and sex, was sufficiently severe or pervasive to alter the terms and conditions of employment for Plaintiff.

171.    Defendants knew or should have known of the race-based hostile work environment because the harassment was frequent and notorious in nature and because Plaintiff complained about it to her supervisor and other supervisors within the organization.

172.    Defendants failed to take prompt or effective action to prevent, correct, or remedy the race-based hostile work environment experienced by Plaintiff.

173.    These acts or omissions by Defendant Young Life were the but-for cause of the race-based hostile work environment experienced by Plaintiff.

174.    Defendant Young Life treated Plaintiff less favorably than her similarly situated non-Latinx counterparts.

175.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect her status as an employee, deprive her of her right to make and enforce contracts, and deprive her of the full and equal benefit of laws, because of her race.

176.    The unlawful employment practices complained of above were intentional.

177.    The unlawful employment practices complained of above were done with malice or reckless indifference to Plaintiff's federally protected rights.

178.    The race-based employment practices of Defendants and their agents, supervisors, and employees directly and proximately resulted in such damages as may

be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and Plaintiff's attorneys' fees and costs in bringing this action.

**SECOND CLAIM FOR RELIEF**
**Negligent Supervision**
**Colorado State Law**

179.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

180.    Defendant Young Life was responsible for all personnel decisions within the organization, including volunteers.

181.    Defendant Young Life has trained staff members supervising field staff and volunteer leaders.

182.    Defendant Young Life owed Ms. Ledezma a duty of care in the supervision and training of volunteers, interns, and staff members.

183.    Defendant Young Life breached that duty by failing to train, monitor, supervise, and discipline Defendant Lange.

184.    Defendant Young Life knew or should have known that Mr. Lange posed a risk to Plaintiff because Plaintiff repeatedly complained about Mr. Lange's behavior in the weeks leading up to the assault.

185.    Defendant Young Life knew or should have known that Plaintiff's harm was a foreseeable manifestation of that risk.

186.   Despite Plaintiff's numerous complaints, Defendant failed to properly supervise Mr. Lange or otherwise discipline him.

187.   As a result, Mr. Lange was permitted to continue sexually assaulting and victimizing Plaintiff.

188.   Defendant Young Life's conduct was willful or wanton or attended by circumstances of malice or reckless disregard for Plaintiff's rights.

189.   As a result of Defendant Young Life's breach of its duty, Plaintiff has suffered economic and non-economic injuries in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Sexual Assault
### Colorado State Law

190.   Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

191.   Mr. Lange sexual assaulted within the meaning of C.R.S. § 13-80-103.7(2).

192.   Mr. Lange subjected Ms. Ledezma to sexual contact as defined in C.R.S. § 18-3-401(4).

193.   Mr. Lange knowingly touched intimate parts of Plaintiff's body or the clothing covering those intimate areas.

194.   Mr. Lange rubbed against Plaintiff's behind and touched her inappropriately on the waist and hips.

195.   Mr. Lange put his hand down Plaintiff's apron and groped her genitalia outside of her pants.

21

196.   Mr. Lange made this contact for the purpose of sexual arousal, gratification, or abuse.

197.   Plaintiff told Mr. Lange his sexual contact was inappropriate and unwanted.

198.   Mr. Lange ignored Plaintiff's complaints.

199.   Defendant Young Life is vicariously liable for Mr. Lange's sexual assault.

200.   Defendant Young Life had actual control or the exclusive right to control the details of Defendant Lange's work performance.

201.   Mr. Lange thus operated as an employee of Defendant Young Life.  *See Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997).

202.   Defendant Young Life retained exclusive rights over other aspects of Defendant Lange's work assignments, such as the right to terminate and the ability to switch volunteers' job assignments.

203.   Mr. Lange sexually assaulted Plaintiff in the camp kitchen while both were conducting work duties assigned by Defendant Young Life.

204.   Defendant Young Life ratified Mr. Lange's conduct by dismissing Plaintiff's complaints and reassuring her that Mr. Lange was a "good guy."

205.   Defendant Young Life also ratified Mr. Lange's conduct by refusing to take any disciplinary action against him or otherwise monitoring his behavior after multiple reports of sexual harassment and assault.

206.   By explaining to Plaintiff that Mr. Lange was "getting to know her" and that the assaults were part of "God's will," Defendant Young Life gave permission for Mr. Lange's behavior to escalate.

207.   The conduct of Defendant Young Life was willful or wanton or attended by circumstances of malice or reckless disregard for Plaintiff's rights.

208.   As a direct result of the actions of Defendant Young Life, Plaintiff has suffered significant injuries, damages, and losses in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Civil Assault**
**Colorado State Law**

209.   Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

210.   Multiple times throughout the six-week camp program, Mr. Lange intended to cause harmful or offensive contact with Ms. Ledezma by pushing his crotch against her while walking by her in the kitchen.

211.   Mr. Lange did not direct this conduct toward other workers.

212.   Mr. Lange intended to and did place Plaintiff in apprehension of such contact.

213.   Defendant Lange's continued unwanted sexual contact of Plaintiff also put Plaintiff in apprehension of imminent offensive sexual contact.

214.   Mr. Lange's contact of Plaintiff was or appeared to be harmful or offensive.

215.   Mr. Lange's contact of Plaintiff resulted in injuries to Plaintiff.

216.    Mr. Lange had no justification for engaging in sexually inappropriate contact with Plaintiff.

217.    Mr. Lange's intent is shown by his repeated behavior, including after Plaintiff asked him to stop.

218.    Defendant Young Life is vicariously liable for Mr. Lange's assault.

219.    Defendant Young Life had actual control or the exclusive right to control the details of Defendant Lange's work performance.

220.    Mr. Lange thus operated as an employee of Defendant Young Life.  *See Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997).

221.    Defendant Young Life retained exclusive rights over other aspects of Defendant Lange's work assignments, such as the right to terminate and the ability to switch volunteers' job assignments.

222.    Mr. Lange sexually assaulted Plaintiff in the camp kitchen while both were conducting work duties assigned by Defendant Young Life.

223.    Defendant Young Life ratified Mr. Lange's conduct by dismissing Plaintiff's complaints and reassuring her he is a "good guy."

224.    Defendant Young Life also ratified Mr. Lange's conduct by refusing to take any disciplinary action against him or otherwise monitoring his behavior after multiple reports.

225.    By explaining to Plaintiff that Mr. Lange was "getting to know her" and that the assaults were part of "God's will," Defendant Young Life endorsed Mr. Lange's conduct and gave permission for it to escalate.

226.   The conduct of Defendant Young Life was willful or wanton or attended by circumstances of malice or reckless disregard for Plaintiff's rights.

227.   As a direct result of the actions of Defendants Lange and Young Life, Plaintiff has suffered significant injuries, damages, and losses in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**Civil Battery**
**Colorado State Law**

228.   Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

229.   Mr. Lange intended to cause harmful or physical contact with Ms. Ledezma by reaching underneath her apron and grabbing her pubic area and vagina.

230.   Mr. Lange caused harmful or physical contact with Plaintiff when he hugged her for an extended period of time after she told him not to touch her.

231.   Mr. Lange knew such contact was harmful or offensive because Plaintiff requested that he stop.

232.   Mr. Lange's contact of Plaintiff was harmful or offensive.

233.   Mr. Lange's contact of Plaintiff resulted in injuries to Plaintiff.

234.   Defendant Young Life is vicariously liable for Mr. Lange's battery.

235.   Defendant Young Life had actual control or the exclusive right to control the details of Defendant Lange's work performance.

236.   Mr. Lange thus operated as an employee of Defendant Young Life. *See Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997).

237.    Defendant Young Life retained exclusive rights over other aspects of Mr. Lange's work assignments, such as the right to terminate and the ability to switch volunteers' job assignments.

238.    Mr. Lange assaulted Plaintiff in the camp kitchen while both were conducting work duties assigned by Defendant Young Life.

239.    Defendant Young Life ratified Mr. Lange's conduct by dismissing Plaintiff's complaints and reassuring her he is a "good guy."

240.    Defendant Young Life also ratified Mr. Lange's conduct by refusing to take any disciplinary action against him or otherwise monitoring his behavior after multiple reports.

241.    By explaining to Plaintiff that Mr. Lange's assaultive behavior was part of "God's will," Defendant Young Life endorsed Mr. Lange's conduct.

242.    Defendant Young Life adopted and confirmed Mr. Lange's conduct by forcing Plaintiff to face Mr. Lange after he assaulted her.

243.    The conduct of Defendant Young Life was willful or wanton or attended by circumstances of malice or reckless indifference for Plaintiff's rights.

244.    As a direct result of the actions of Defendant Young Life actions, Plaintiff has suffered significant injuries, damages, and losses in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotion Distress**
**Colorado State Law**

245.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

246.    Defendant Young Life's negligent conduct created an unreasonable risk of harm to Plaintiff.

247.    Defendant Young Life's conduct resulted in Plaintiff fearing for her safety, both physically and emotionally.

248.    The conduct Defendant Young Life permitted to continue caused Plaintiff anxiety, fear, shock, and impairment of her quality of life.

249.    Plaintiff emotional distress was so severe that it manifested into anxiety attacks before work that caused her to vomit.

250.    Plaintiff repeatedly reported Mr. Lange's sexual misconduct to Defendant Young Life giving them knowledge of the risk he posed.

251.    Defendant Young Life refusal to act on this knowledge, including allowing Mr. Lange to remain with the organization caused Plaintiff more emotional distress and ultimately led her to resign.

252.    Defendant Young Life's conduct was willful or wanton or attended by circumstances of malice or reckless indifference for Plaintiffs' rights.

253.    As a direct result of Defendant Young Life's actions, Plaintiff has suffered significant injuries, damages, and losses in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**Colorado Premises Liability Act**
**C.R.S. § 13-21-115**

254.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

255.    At all relevant times, Defendant Young Life was the "landowner" of the Premises, as defined by Colo. Rev. Stat. § 13-21-115(1).

256.    At all relevant times, Plaintiff was an "invitee" on the Premises, as defined by Colo. Rev. Stat. § 13-21-115(5)(a) and Colorado law interpreting the statute.

257.    As the owner and/or operator of the Premises, Defendant Young Life owed Plaintiff duties to exercise reasonable and ordinary care to make its premises safe for those who may enter upon them and to protect against dangers of which it actually knew or should have known.

258.    Defendant Young Life knew or should have known that Mr. Lange posed a danger to Plaintiff.

259.    Plaintiff informed Defendant Young Life as early as May 29, 2019 that Defendant Lange was inappropriately touching her while the two were working in the camp kitchen.

260.    For weeks, Defendant Young Life took no steps to remedy the dangerous condition and thus failed to exercise reasonable care to protect Plaintiff from harm.

261.    Defendant Young Life's failure to exercise reasonable care constitutes a violation of the Colorado Premises Liability Act.

262.    Defendant Young Life's failure to exercise reasonable care to protect Plaintiff against dangers about which it actually knew or should have known was a direct, foreseeable, and proximate cause of Plaintiff's damages and losses.

**NOTICE OF EIGHTH CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, *et. seq.***

251.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

252.    Plaintiff is contemporaneously filing a Charge of Discrimination with the EEOC against Defendant Young Life alleging discrimination on the basis of sex, race, and national origin as well as retaliation in violation of Title VII.

253.    Plaintiff will seek leave to amend this Complaint to reflect administrative exhaustion of her Title VII charges as soon as Notice of Right to Sue is received.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Ledezma respectfully requests that the Court enter judgment for the following relief:

a.      Actual economic damages as established at trial;

c.      Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.      Front pay in lieu of reinstatement;

e.     Punitive damages for all claims as allowed by law in an amount to be

       determined at trial

e.     Exemplary damages for all claims as allowed by law in an amount to be

       determined at trial;

g.     Pre-judgment and post-judgment interest at the highest lawful rate;

h.     A tax penalty offset;

i.     Attorneys' fees and costs as allowed by law; and

i.     Such further relief as justice requires.


**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


DATED: June 26, 2020

RATHOD | MOHAMEDBHAI LLC

*s/ Ellen K. Giarratana*
Ellen K. Giarratana
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
eg@rmlawyers.com
ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF