**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-cv-01896-NYW

LAUREANA LEDEZMA,

Plaintiff,

v.

YOUNG LIFE,

Defendant.

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Plaintiff Laureana Ledezma moves pursuant to Federal Rule of Civil Procedure 26(c) for a protective order preventing Defendant Young Life from conducting discovery into Plaintiff's past trauma. Specifically, Ms. Ledezma seeks to prevent Young Life from engaging in third-party discovery, including, but not limited to, seeking documents and information about such trauma from witnesses or deposing members of her family and her mental health provider.

At its core, this action stems from sexual harassment and assaults that occurred at a Young Life camp and Defendant's ratification of the harassers' behavior. Ms. Ledezma's past trauma does not alter Defendant's liability nor susceptibility to damages in this case. Third-party discovery into Ms. Ledezma's past trauma is thus entirely irrelevant to the parties' claims and defenses and disproportionate to the needs of the case, particularly given that Defendant can still obtain discovery directly from Ms. Ledezma by questioning her, for example, during her deposition about the trauma. Such discovery serves only to distress, humiliate, and oppress Ms. Ledezma, and the Court should be particularly concerned with overreaching discovery into a victim's personal life.

1

Such invasive discovery techniques have historically resulted in unfair prejudice against targets of sexual harassment and precipitated a widespread chilling effect on other victims stepping forward.

## CONFERRAL

During the scheduling conference in this matter, undersigned counsel informed the Court of a potential discovery dispute regarding Defendant's inquiries into Plaintiff's past trauma. At that time, the Court instructed the parties to meet and confer about how to proceed. **Ex. 1**, *Transcript of Fed.R.Civ.P. 16 Hearing*, 15:21-16:1; [ECF No. 18, *Scheduling Order*, at 14]. The parties agreed to brief the issue and informed the Court of such. *See* **Ex. 2**, *2020.09.21 Email*; **Ex. 3**, *2020.09.30 Email*.

### I.     FACTUAL BACKGROUND

Plaintiff, who is a Hispanic female, initiated this lawsuit in response to Defendant's failure to respond adequately to sexual harassment and an assault that she experienced while working at Rocky Creek Ranch, a Young Life summer camp. While working in the camp kitchen, two male colleagues, Jake Hotzfield and Cory Lange, made unwanted sexual advances towards Ms. Ledezma, frequently pressing their bodies against hers and intentionally pushing into her with their crotches. [ECF 1, *Complaint*, at ¶¶ 52-53]. Although Ms. Ledezma complained to numerous managers in the organization, Young Life did nothing. Acting with impunity, Mr. Lange escalated his attacks on Ms. Ledezma, repeatedly stroking and groping her butt, shoulders, back, and waist. [*Id.* at ¶¶ 70, 72]. Several times, he reached between Ms. Ledezma's legs and stroked her inner thighs near her underwear. [*Id.* at ¶ 71]. These assaults ultimately culminated with Mr. Lange thrusting his hand under Ms. Ledezma's apron and grabbing her genitals over her linen pants. [*Id.* at ¶ 97]. In response to knowledge of these assaults, Young Life abandoned Ms. Ledezma, telling

her that sexual harassment was "God's plan" for her and thus compounding and exacerbating the

racially and sexually hostile work environment she was subjected to. [*Id.* at ¶ 156].

Unsurprisingly, Young Life denies that Ms. Ledezma was sexually harassed or assaulted

while at Rocky Creek Ranch, although Young Life does admit that Ms. Ledezma complained about

Mr. Lange's behavior at least once. [*See* ECF No. 22, *Answer*, at ¶¶ 56, 70-72, 151]. In support of

discovery into Ms. Ledezma's unrelated trauma, Defendant asserts the following rationale:

> …You know, the allegations in the complaint are pretty terrible, so I have already engaged in a pretty significant fact investigation both for purposes of the civil litigation matter, but also because we have the EEOC charge pending on the sexual harassment allegations.
>
> And just based on my investigation thus far, it seems to me that Plaintiff has alleged to staff members and volunteers at Young Life that she had had some sort of [past trauma], is my understanding.
>
> **And it seems to me, and of course I'm not [a] psychologist, but her past trauma could potentially inform her current perception of events. And, frankly, she kind of said as much to people at Rocky Creek Ranch that essentially she may be a little more sensitive to being in a tight space because of her past [trauma].**

**Ex. 1** at 13:12-14:3 (emphasis added). Although Defendant's use of the term "sensitive" here

makes the request seem innocuous, the implication is nevertheless that as a result of past trauma

and suffering from emotional trauma, Ms. Ledezma somehow does not have the capacity to

understand when she is being sexually harassed or assaulted, and is therefore fabricating such

claims. In other words, women like Ms. Ledezma cannot be trusted to know what is happening to

their own bodies. "Sensitivity," as used by Defendant this way, is nothing more than a euphemism

for portraying Ms. Ledezma, and other women who have suffered some sort of trauma like her, as

crazy, hysteric, and delusional, and, consequently, as untrustworthy. This is a thoroughly debunked trope.

Ms. Ledezma's past trauma is unrelated and irrelevant to the instant case, and discovery will cause irreparable harm to her family relationships and psychological health, only compounding the damage already caused by Young Life's misconduct. Invasive discovery into her past serves no purpose other than to oppress and harass Ms. Ledezma, and to chill future victims of harassment from stepping forward.

## II.   STEREOTYPES OF VICTIMS OF SEXUAL HARASSMENT RELEVANT TO THIS DISPUTE

Although the exact scope of Defendant's intended discovery into Ms. Ledezma's past trauma remains unclear, virtually any discovery seems ill-suited given Young Life's stated objectives for pursuing such inquiries. As an initial matter, Young Life has failed to support its theory with any factual or scientific evidence that Ms. Ledezma's unrelated past trauma has any tendency to make more or less probable that she suffered sexual advances and assaults at Young Life. Rather, in arguing as it does, Young Life relies on the malicious and mistaken stereotype that female victims of sexual harassment are paranoid, hysteric, and oversensitive, possibly as a result of other difficult experiences in their lives. *See, e.g.*, Andrea A. Curcio, *Rule 412 Laid Bare: A Procedural Rule That Cannot Adequately Protect Sexual Harassment Plaintiffs from Embarrassing Exposure*, 67 U. CIN. L. REV. 125, 154-56 (1998) (noting the tendency of defendants to seek discovery on plaintiffs' childhoods "to prove that the defendant is not liable because the plaintiff was 'hypersensitive'"); Epstein, D. & Goodman, L., *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. PA. L. REV. 399, 434-35 (2019) (explaining that historically powerless groups, including women of color, are often "associated with attributes related to poor truth-telling in particular: things like over-

4

emotionality, [and] lack of logical thinking" and noting such perceptions stem from Sigmund Freud and are embedded in contemporary culture).

History is rife with examples of how women who report sexual harassment are portrayed as hysterical, crazy, and too sensitive in an effort to undermine their claims and reinforce sexist workplace hierarchies and cultures.[1] *See* Epstein & Goodman, *supra*, at 446-48 (explaining that perpetrators of sexual harassment and abuse will often discredit their victims by telling them they are hysterical, over-emotional, and crazy and "credibility discounts . . . by the justice system and other institutions often echo those imposed by" the abuser); *id.* at 459 ("[T]hese same discounts pervade workplaces where women are sexually harassed"). One of the best examples of this phenomenon is Anita Hill, who during Clarence Thomas's senate confirmation hearings, was derided by conservatives as "a little bit nutty and a little bit slutty." David Brock, *Kavanaugh's Accuser Should Unfortunately Expect the Anita Hill Treatment from Republicans*, NBC News (Sept. 17, 2018, 1:04 PM), https://www.nbcnews.com/think/opinion/kavanaugh-s-accuser-should-unfortunately-expect-anita-hill-treatment-republicans-ncna910226. The architect of this attack strategy, David Brock, has since acknowledged that his efforts were a "vicious and wholly unfounded smear."[2] He has also since publicly admitted that he sought to depict another woman sexually harassed by Thomas who wished to testify as "emotionally unstable and sexually

---

[1] Stereotypes and biases are only compounded when race plays a factor in sexual harassment. *See* Mary E. Becker, *Needed in the Nineties: Improved Individual and Structural Remedies for Racial and Sexual Disadvantages in Employment*, 79 GEO. L.J. 1659, 1675–76 (1991) ("Discrimination against women of color often operates differently, is fueled by different factors, and results in different stereotypes, than discrimination against either men of color or white women.").

[2] Now, as more and more women are speaking out about their experiences with sexual harassment, a new twist is being added to the narrative on the crazy female; namely, the argument goes that accusers are manufacturing claims because they want "the sympathy and attention." Tovia Smith, *On #MeToo, Americans More Divided by Party Than Gender*, National Public Radio, (Oct. 31, 2018, 5:00 AM), https://www.npr.org/2018/10/31/662178315/on-metoo-americans-more-divided-by-party-than-gender.

promiscuous." *Id.* The point, of course, was to discredit Justice Thomas's accusers by playing into societal gender stereotypes.

Unfortunately, decades after the Anita Hill hearings, defendants continue to seek discovery into a victim's unrelated sensitive personal history in the effort to promote the stereotype that the plaintiff is crazy or nutty – *i.e. "oversensitive"* – and therefore fabricating allegations of sexual harassment. *See* Curcio, *supra*, at 125 (providing commonly used "myths and sexual stereotypes that have shaped sexual harassment law," including that women "are just overreacting to harmless jokes and flirtation"). This misconception of the female harassment victim is so widespread and pernicious that courts have begun to push back in discovery. *See, e.g.*, *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1292-93 (8th Cir. 1997) (noting the special master's error in permitting discovery into the "medical histories, childhood experiences, domestic abuse, abortions, and sexual relationships" because such discovery was entirely irrelevant (or so remote in time) to plaintiff's emotional injuries). Likewise, policymakers have introduced protections for victims of sexual harassment and assault. For example, both the Federal Rules of Civil Procedure and state law presumptively prohibit discovery into a victim's sexual and intimate relationships and conduct. Fed. R. Evid. 412; C.R.S. § 13-25-138. Although Ms. Ledezma's past trauma was not of a sexual nature, the threat of oppression and prejudice are equally present here and Defendant's relevance theory is equally spurious. For these reasons, a protective order is warranted in this case.

## III.   LEGAL ANALYSIS

### a.   *Legal Standard for a Protective Order*

Federal Rule of Civil Procedure 26(b)(1) limits the scope of discovery to evidence relevant to any party's claims or defenses and proportional to the needs of the case. Upon a showing of good cause, a court may issue a protective order limiting discovery to protect a party or person

from "annoyance, embarrassment, oppression or undue burden or expense." Fed.R.Civ.P. 26(c)(1); *see Cooke v. N.M. Junior Coll. Bd.*, 579 F.2d 568, 570 (10th Cir. 1978) (noting that broad discovery into plaintiff's diary would only serve to cause embarrassment). Specifically, a court may prohibit discovery into a particular topic altogether, prescribe an alternative discovery method, or limit the scope of such discovery. Fed.R.Civ.P. 26(c)(1). The decision to issue a protective order rests within the sound discretion of the district court. *See Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990).

The moving party demonstrates good cause by "show[ing] that disclosure will result in a clearly defined and serious injury to that moving party." *Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003). "[T]he 'good cause' calculation requires that the Court balance the moving party's need for information against the injury which might result from unrestricted disclosure." *Zvelo, Inc. v. SonicWALL, Inc.*, No. 06-cv-00445-PAB-KLM, 2013 WL 2338352, at *3 (D. Colo. May 29, 2013) (internal quotation marks, alterations, and citations omitted). However, "the good cause standard is highly flexible, having been designed to accommodate all relevant interests as they arise." *Blatchley v. Cunningham*, No. 15-cv-00460-WYD-NYW, 2015 WL 9434459, at *2 (D. Colo. Dec. 24, 2015) (citing *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008)). The authority of trial courts to issue protective orders under Rule 26(c) is broad because of the significant potential for abuse and important privacy interests that may be implicated by discovery. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34-35 (1984).

### b. *Ms. Ledezma's Unrelated Past Trauma is Beyond the Scope of Discovery Under Rule 26(b)(1)*

Given the lack of relevance her past trauma has to the claims and defenses in this case and the imminent, serious harm such discovery will entail, good cause exists for this Court's issuance of a protective order.

### i.   Ms. Ledezma's Past Trauma is Not Relevant to Defendant's Liability for Sexual Harassment and Assault

Ms. Ledezma brings Title VII and Section 1981 claims, as well as various state tort claims, for which she alleges Young Life is either vicariously liable or directly negligent. As an initial matter, Ms. Ledezma's past trauma is irrelevant as it does not have any tendency to make it more or less probable that Messrs. Lange and Hotzfield sexually harassed and assaulted her. *See* Fed. R. Evid. 401 (Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence."). With respect to Ms. Ledezma's family members, interviewing or deposing them will not yield evidence relevant to any claim or defense in this case. Her family members have no personal knowledge about the facts underlying Ms. Ledezma's allegations of sexual or racial harassment at Young Life because they were not present at the camp, nor were they in communication with her at the time the harassment and assault occurred. *See* Fed.R.Civ.P. 26(b)(1); Fed. R. Evid. 602 (providing that lay witnesses may only testify to matters in which they have personal knowledge). Furthermore, Ms. Ledezma does not intend to call any of her family members as witnesses at trial.

Likewise, Ms. Ledezma's family members may not speculate as to how any trauma she suffered effected Ms. Ledezma's perception of harassment or the emotional impact resulting therefrom. *See United States v. Tapaha*, 891 F.3d 900, 906 (10th Cir. 2018) (affirming exclusion of statements speculating about defendant's state of mind); *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 927 (D. Colo. 2017) (noting that speculative testimony about another party's motivation is inadmissible, citing Fed. R. Evid. 602). Only Ms. Ledezma can testify to her perceptions or emotions.

Defendant seems to suggest, however, that Ms. Ledezma's past trauma is relevant to its defense that the sexual harassment and assault never occurred. It presumably plans to argue that

8

Ms. Ledezma's past trauma, which was not even sexual in nature, caused her to imagine that she was sexually harassed and assaulted. However, the appropriate method for proving an act did not occur is through the introduction of proper evidence at trial, not through the introduction of unfounded prejudicial stereotypes. For example, Defendant can present the testimony of Messrs. Lange and Hotzfield who presumably will deny that the harassment took place, or the testimony of other employees stating they never witnessed such harassment. Further, if any documentation exists to rebut Ms. Ledezma's allegations, Young Life may present such documents in support of the theory that the harassment did not occur.

Defendant should not be permitted to interject biases and harmful stereotypes into this litigation in an effort to show that Ms. Ledezma is somehow deluded about the harassment and that it is all just a figment of her imagination. *Cf. Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) (explaining that even if an expert's testimony regarding Korean business practices "might have been admissible as expert testimony, it was so tinged with ethnic bias and stereotyping that it should have been excluded under Rule 403's balancing test"); *United States v. Brown*, 308 F. Supp. 3d 620, 624 (D.R.I. 2018) (excluding "photograph would play into racial stereotyping about African American men as 'sexual exploiters' of white women," finding it was unfairly prejudicial). Though the standard for permitting discovery under Rule 26(c) is less stringent than that governing the admission of evidence at trial, the Court should treat the abusive discovery tactics sought here as it would with discovery presumptively prohibited by Federal Rules of Evidence 412.  Specifically, given the unlikelihood that the evidence will be admissible at trial and the public policy considerations at stake, the presumption should be to issue a protective order barring discovery into Ms. Ledezma's past trauma. *See* Fed.R.Evid. 412, Advisory Committee Note (1994) ("In order not to undermine the rationale of Rule 412, however, courts should enter

appropriate orders pursuant to Fed.R.Civ.P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality."); *see also Ratts v. Bd. of Cty. Comm'rs,* 189 F.R.D. 448, 451 (D. Kan. 1999) (same); *Williams v. Bd. of Cty. Comm'rs*, 192 F.R.D. 698, 704 (D. Kan. 2000) ("Although Rule 412 is a rule controlling the admissibility of evidence rather than its discoverability, numerous court have applied the rule to decide discovery motions…'in order not to undermine [its] rationale.'" (citation omitted)).

Permitting the introduction of such harmful female stereotypes would encourage a jury – already predisposed to societal beliefs about women's credibility – to draw conclusions based on prejudices rather than the evidence. *See* Sarah A. DeCosse, *Simply Unbelievable: Reasonable Women and Hostile Work Environment Sexual Harassment*, 10 LAW & INEQ. 285, 287 (1992) (noting a study that found women are perceived as less credible than men); *id.* at 295 ("The decisions in sexual harassment cases reflect stereotypical presumptions of women's experiences."). Using gender bias and stereotypes as proof that sexual harassment and assault did not occur should have no place in our justice system.

### ii.    *Plaintiff's Past Trauma is Not Relevant to Ms. Ledezma's Damages*

Insofar as Defendant is attempting to limit damages based on Plaintiff's alleged sensitivities, it is well-settled that defendants take their plaintiffs as they find them. *See, e.g.*, *McLaughlin v. BNSF Ry. Co.*, 300 P.3d 925, 934-35, 2012 COA 92, ¶ 35 (Colo. App. 2012) (explaining that a "tortfeasor may not escape or reduce liability because the victim's pre-existing condition made him more susceptible of injury from the tortfeasor's conduct"). A defendant is thus liable for damages resulting from its wrongful act regardless of any previously existing condition, including mental conditions, that may have made the wrongful act felt more severely by the plaintiff than others without similar conditions. *See id.*; *Jenson*, 130 F.3d at 1294-95 (applying "the universal doctrine of tort law that a tortfeasor must take the plaintiff as it finds her" to Title

VII); *Fox Pittsburgh State Univ.*, 257 F. Supp. 3d 1112, 1155-57 (D. Kan. 2017) (applying the "eggshell skull" principle to a Title VII claim, in which the plaintiff had pre-existing anxiety following the death of her mother).

Thus, even if Ms. Ledezma's history of trauma made her claustrophobic and particularly sensitive to working in tight spaces with others, it would have no bearing on a damages award. Because Plaintiff's history is irrelevant to the damages in this case, this Court should forbid Defendant from conducting discovery into Plaintiff's prior trauma.

### iii. Discovery into Ms. Ledezma's Past Trauma is Disproportionate to the Needs of the Case

To fall within the scope of discovery, information must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed.R.Civ.P. 26(b)(1). Initially, the discovery sought is irrelevant and thus its benefit is minimal while the costs of such invasive discovery is significant, as discussed in detail below. Further, Defendant has sufficient access to the information it seeks without obtaining discovery from Ms. Ledezma's family members and mental health provider. *See Meeker v. Life Care Centers of Am., Inc.*, No. 14-CV-02101-WYD-NYW, 2015 WL 5244947, at *2 (D. Colo. Sept. 9, 2015) (noting, under the principles of proportionality, that a protective order may be warranted when the discovery sought "may be obtained from some other source that is more convenient, less burdensome, or less expensive."). Defendant may ask Plaintiff herself whether she had a history of trauma and what impact such history has on her current levels of emotional distress or perceptions of her workspace without deposing third parties.  *See Reyes*, 898 F. Supp.

11

2d at 1236 (noting that defendant had "other avenues to obtain the information they seek"). Thus, there is no need to depose others, and doing so is not proportional to the needs to the case.

### c. *Irreparable Harm Will Come to Plaintiff if Discovery is Permitted on Her Past Trauma*

#### i. *Defendant Should Be Precluded from Contacting or Deposing Plaintiff's Family Members*

Besides its complete irrelevance, permitting discovery of unrelated past trauma is invasive and unfair not only to Ms. Ledezma but to her family members, who are not parties in this litigation. Such inquiries would almost certainly and unnecessarily reopen old wounds while simultaneously providing no evidence supporting the claims or defenses at issue in this case. *Cf. Reyes v. Snowcap Creamery, Inc.*, 898 F. Supp. 2d 1233, 1236 (D. Colo. 2012) (concluding that discovery regarding plaintiff's "immigration status is a calculated attempt . . . to intimidate and harass him"); *EEOC v. Donahue*, 746 F. Supp. 2d 662, 667 (W.D. Pa. 2010) (concluding that any probative value of a woman's perception of "banter" at a different workplace did not "substantially outweigh[] the potentially prejudicial and chilling effect that would be produced by permitting such discovery"). Injecting the issue of Ms. Ledezma's past trauma in this case would serve only to "embarrass, humiliate, traumatize, [and] stigmatize" Ms. Ledezma and her family and "thus delay the psychological healing that must take place" among family members. Kathleen S. Bean, *Changing the Rules: Public Access to Dependency Court*, 79 DEN. U. L. REV. 1, 3 (2001) (noting the effect of open proceedings in dependency court).

Given the harm, embarrassment, and disruption that would come with contacting and questioning Ms. Ledezma's family members about irrelevant and private family matters, such discovery should not be permitted.

### ii. The Physician-Patient Privilege Limits Discovery into Plaintiff's Mental Health Provider and Therapy Records

Patients enjoy the privilege of confidential communication with their psychotherapists. *See Jaffee v. Redmond*, 518 U.S. 1, 10 (1996). Unless such privilege is waived, "communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Id.* at 15. One way a party waives the privilege is by placing her mental condition at issue. *Fox v. Gates Corp.*, 179 F.R.D. 303, 305 (D. Colo. 1998).

There is a split among district courts in this circuit about whether asserting garden variety emotional distress damages waives the psychotherapist-patient privilege. *Compare id.* at 305-06 (joining the minority view that claims garden variety emotional distress damages waives the psychotherapist-patient privilege), *with Kear v. Kohl's Dep't Stores, Inc.*, No. 12-CV-1235-JAR-KGG, 2013 WL 3088922, at *3 (D. Kan. June 18, 2013) ("'Garden variety' emotional distress can . . . prevent disclosure of information protected under psychotherapist-patient privilege."). Notably, Colorado joins the majority approach that garden variety emotional distress damages does not waive the psychotherapist-patient privilege, noting "to hold otherwise . . . would degrade the privileges and undermine the public policy of preserving confidence that they were designed to implement." *Johnson v. Trujillo*, 977 P.2d 152, 158 (Colo. 1999) (finding no waiver with respect to plaintiff's divorce and marriage counseling records).

Ms. Ledezma's claims seek garden variety emotional distress damages.[3] Discovery into Ms. Ledezma's mental health would thus be of such nominal relevance to justify its wholesale

---

[3] Though a plaintiff's mental condition is relevant to claims of negligent infliction of emotional distress, undersigned counsel intends to confer with defense counsel and stipulate or move to voluntarily dismiss her claim of negligent infliction of emotional distress pursuant to Fed.R.Civ.P. 41(a)(1).

disclosure. *See Auer v. City of Minot*, 178 F. Supp. 3d 835, 844-45 (D.N.D. 2016) (noting the irrelevance or marginal relevance of a civil rights plaintiff's mental health records). Whatever emotional distress she has suffered because of past trauma has minimal, if any, relevance to her claimed damages under Title VII and Section 1981. *See id.* (noting the "marginal relevance" of plaintiff's mental health records in a civil rights action); *Fritsch*, 187 F.R.D. at 634 (same). And garden variety emotional distress damages for humiliation, anger, and embarrassment, are easily understood by jurors without the need to provide invasive and supporting evidence from Ms. Ledezma's mental health records or provider. *See Auer*, 175 F. Supp. 3d at 845 ("[J]urors can readily evaluate the legitimacy of claims for damages for these emotions based on the examination and cross-examination of plaintiff . . . ."). Permitting unlimited discovery into Ms. Ledezma's mental health for garden variety emotional distress would eviscerate the purpose of the privilege. *See Johnson*, 977 P.2d at 158 (noting that finding waivers in typical emotional distress cases "would open up a' pandora's box of inquiry into the mental condition of claimants'" (citation omitted)).

Among those who have been subjected to sexual harassment at work, "through no fault of their own, . . . there will always be a certain proportion who have sought counseling for unrelated personal problems or who are suffering from unrelated emotional difficulties." *Id.* Allowing such discovery in these cases would thus turn the privilege into an exception rather than the rule. *See id.* Considering the important public policy behind protecting the communications of a therapist and patient and Defendant's impermissible reason for inquiring into Ms. Ledezma's history and records, this Court should join the majority view and find no waiver in claims of garden variety emotional distress damages. *Castillo v. Villa*, No. CV 15-344 SCY/KK, 2016 WL 10592207, at

*6 (D.N.M. Jan. 22, 2016) (outlining the divergent approaches for ascertaining whether the privilege has been waived).

Ms. Ledezma's claims for emotional distress damages should not waive her psychotherapist-patient privilege, particularly when she neither contends that she suffered from extreme emotional distress nor does she intend to call her psychologist as a witness. At the very least, discovery should be circumscribed temporally and substantively to emotional distress caused by the harassment and assault at Rocky Creek Ranch. *See Weil v. Dillon Companies, Inc.*, 109 P.3d 127, 131 (Colo. 2005) (concluding that the trial court abused its discretion by authorizing a "blanket disclosure of medical records without first determining the extent that the records requested were related to [the plaintiff's] injuries and damages claimed").

### d. Public Policy Considerations Support a Protective Order

#### i. Permitting Invasive Discovery into Ms. Ledezma's Personal Life Sets a Troubling Precedent and Will Have a Chilling Effect on Future Victims

Courts have regularly issued protective orders in the face of foreseeable chilling effects when oppressive discovery tactics are meant to dissuade potential litigants from enforcing their rights. *See Carzola v. Koch Foods of Miss., LLC*, 838 F.3d 540, 562-63 (5th Cir. 2016) (noting that discovery into U visa information in a sexual harassment case "might intimidate individuals outside this litigation, compromising the U visa program and law enforcement efforts more broadly"); *EEOC v. Restaurant Co.*, 448 F. Supp. 2d 1085, 1088 (D. Minn. 2006) ("[P]ermitting employers to use the discovery process to inquire into workers' immigration status would have an unacceptable chilling effect on the bringing of civil rights actions, which would result in countless acts of illegal and reprehensible conduct going unreported" (citation omitted)). In *Carzola*, for example, a poultry processing plant sought discovery into the plaintiffs' U-visa applications, claiming that such information would show that the plaintiffs lied about sexual harassment and

abuse to obtain U visas. 838 F.3d at 544-45, 557. The Fifth Circuit underwent a thorough chilling effect analysis, noting in part the concern that "immigrants are disproportionately vulnerable to workplace abuse and, not coincidentally, highly reluctant to report it for fear of discovery and retaliation." *Id.* at 563.

The same principle applies here, though for different reasons. Sexual harassment and assault survivors historically hesitate or refuse to seek justice out of fear of not being believed and having their private lives or personality traits publicly used against them. *See* Epstein & Goodman, *supra*, at 446-47; Curcio, *supra*, at 136 (noting that "ninety percent of sexual harassment victims reported that they were unwilling to come forward for two primary reasons: fear of retaliation and fear of loss of privacy"). Such fear is justified when sexual harassment litigation turns into a trial on the survivor's behavior, character traits, and past life experiences. *See* DeCosse, *supra*, at 291 (noting that victims of sex crimes and their lifestyle often become the focus of trial). Women learn that when they come forward, any aspect of their character is fair game for ridicule. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) (finding no error in admitting evidence of plaintiff's provocative speech and dress); *Ferencich v. Merritt*, 79 Fed. App'x 408, 415 (10th Cir. 2003) (admitting references to plaintiff's pierced tongue and eyebrow, including testimony that the "sexual purpose of a tongue ring was 'obvious'"). The intended result is to stigmatize survivors who come forward and encourage potential victims to remain silent. *See* Epstein & Goodman, *supra*, at 453 ("Women are devalued and gaslighted from every direction, discouraging them from continuing to seek systemic support."). Permitting discovery into Ms. Ledezma's past will undoubtedly send a damaging message to other women and chill future victims of sexual harassment or assault from attempting to vindicate their rights.

16

> ii.   *The Veracity of Ms. Ledezma's Claims Should be Based Upon Legitimate Credibility Assessments and Not on Unfounded Stereotypes*

Given that punitive discovery tactics such as the one sought for use by Defendant ultimately limit access to justice, *see* Epstein & Goodman, *supra*, at 451-52, these should have no place in the discovery process. Instead, the question of whether Ms. Ledezma was harassed and assaulted should be answered by a jury assessing the credibility of witnesses without the taint of prejudice. Women are already at a disadvantage when it comes to credibility determinations as they "are seen as overly emotional, hypersensitive, and prone to exaggerate." Curcio, *supra*, at 160. The effect is that a victim of sexual assault must "not only . . . prove her case against the defendant, but also . . . demonstrate her own credibility." DeCosse, *supra*, at 288. This burden to demonstrate credibility "does not exist for victims of other crimes, whose sincerity is rarely challenged." *Id.*

With the intent of purging unfair bias from the decision-making process, courts and legislatures over the years have implemented measures to prevent defendants from using a victim's irrelevant background to challenge her truthfulness. *See id.* at 288-89 (noting that rape-shield laws and expert testimony on Rape Trauma and Battered Woman Syndromes have improved the credibility of victims of rape and marital rape). Using Ms. Ledezma's irrelevant past trauma to attack her credibility improperly relies on the prejudicial hysterical female trope, commonly associated with exaggeration and unreliability. Epstein & Goodman, *supra*, at 422. Courts have made clear that cases should be judged on their merits and not discriminatory animus. *See, e.g.*, *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (puncturing the sanctity of the jury in a case of racial bias, "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice"); *Commil USA, LLC v. Cisco Sys. Inc.*, 720 F.3d 1361, 1369-70 (Fed. Cir. 2013), *vacated in part on other grounds*, 575 U.S. 632, (2015) (granting a new

trial for defense counsel's irrelevant and inflammatory anti-Semitic rhetoric). Courts are thus careful to ensure that no such stereotypes see the light of day before a jury. Given that, discovery should not be allowed here, because it is not geared at uncovering relevant evidence to be used at trial, nor is it proportional to the needs of the case.

## IV.   CONCLUSION

Ms. Ledezma respectfully requests that the Court issue a protective order precluding Defendant from conducting third-party discovery into Ms. Ledezma's past trauma. To the extent the Court concludes Ms. Ledezma's history may be relevant, Defendant is still free to ask her about such trauma in her deposition. The issuance of a protective order will protect her and other sexual harassment victims from abusive discovery tactics and ensure that they have holistic access to justice.

Respectfully Submitted,

*/s Ellen K. Giarratana*
Ellen K. Giarratana
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Ste 100
Denver, Colorado 80205
303-578-4400 (t)
303-578-4401 (f)
eg@rmlawyers.com
ih@rmlawyers.com